STATE OF CALIFORNIA, DEPARTMENT OF MENTAL HYGIENE
v. DALE W. COPUS*

No. A-6363. Decided January 15, 1958.
Rehearing overruled February 19, 1958.
(309 S.W. 2d Series 227)

*Certiorari to Supreme Court of U.S. denied. 356 U.S. 967(4), 78 Sup. Ct. 1006(4), 2 L. Ed. 2d 1073.

*Edmund G. Brown*, Attorney General of the State of California, *Elizabeth Palmer*, Assistant Attorney General, and *Chancellor & Wood*, of Dallas, for petitioner.

*Pat Reed*, of Dallas, for respondent.

MR. JUSTICE CULVER delivered the opinion of the Court.

The State of California, petitioner, sued respondent, Dale W. Copus, now domiciled in Texas, for money expended by the State in the care, support and maintenance of his mother, an incompetent inmate of a state institution. A judgment for the full amount sued for was reversed and rendered by the Court of Civil Appeals. 301 S.W. 2d 217. We concur in the holding of the Court of Civil Appeals that no recovery can be had for support furnished after respondent removed to and became domiciled

in this state. But we disagree with the conclusion that the Texas two-year statute of limitation would apply to that portion of the claim arising prior to the removal of the respondent and that the maintenance of this action would be contrary to our public policy.

Prior to the 16th day of July, 1951, Copus was a resident citizen of the State of California. On that date he changed his domicile and residence to the State of Texas where he has continued to reside. For a number of years prior to the son's removal to Texas the mother had been continuously and was at the time of the filing of this suit a patient in one of the California state hospitals.

By California statute an adult son is legally obligated to reimburse the state for sums expended by the state in the care and maintenance of an indigent parent in a state institution. Additionally the statute provides (Section 345, Code of Civil Procedure) as follows: "The limitations prescribed in this chapter apply to actions brought in the name of the State or county or for the benefit of the State or county, in the same manner as to actions by private parties, except that actions for the recovery of money due on account of the support of patients at State or county hospitals may be commenced at any time within four years after the accrual of the same." Pursuant to the provisions of the Welfare and Institution's Code the Director of Mental Hygiene of California fixed the rate for the care and support of this incompetent mother at $40.00 per month as of the 1st day of July, 1944. This rate was continued until the 1st day of August, 1951, when the Director increased the rate to $90.00 per month. That rate was continued up to the time of the filing of this suit. The State of California sued respondent in the Texas court for the support of his mother at the rates prescribed for a period of four years prior to the bringing of this suit.

Three questions are presented: (1) Does the claim asserted by the State of California against Copus constitute a continuing obligation enforceable by the Texas courts for the mother's support and maintenance that accrued after Copus has removed to and become domiciled in Texas? (2) Does the Texas two-year statute of limitation apply to this cause of action rather than the law of California? (3) Is the enforcement of this claim contrary to the public policy of the State of Texas?

No clear cut answer to these questions can be found by a

search of the Texas authorities, at least in so far as the first two are concerned, but a review of the decisions in this and other jurisdictions impels the conclusion that all three should be resolved in the negative.

■ The general rule rather universally recognized is that the statutes of a state ex proprio vigore have no extraterritorial effect. It must be concluded, therefore, that the California statute could not create a legal obligation upon a citizen of Texas who was not a citizen of California when the obligation arose, that is, at the time the mother became institutionalized in California or at any time thereafter. We are aware of no rule of law that would make the obligation a continuing one after removal from California even though it attached to him while a resident of that state. Citizens of a state equally share the burdens and privileges of citizenship regardless of when or how that status is attained. To say that the support statute compelled liability for that period of time after the respondent moved to Texas would seem to deny to him equality with other citizens of the state.

■ Petitioner contends that the obligation statutorily imposed is quasi or constructively contractual. On that premise it invokes the universal rule that the validity and interpretation of a contract are to be determined according to the law of the state where the contract is made and if valid there it is likewise valid elsewhere. To support this premise petitioner relies on the decision in State v. Stone, 271 S.W. 2d 741, Texas Civ. App., holding a similar Texas support obligation to be quasi contractual and thus a legal charge against the estate of the deceased obligor. But the claim in the Stone case matured during the lifetime of the obligor, the only question being whether the debt could be collected after his death from the estate. The court did not hold that the obligation survived the father's death to the extent of making the estate liable for any care and maintenance furnished to the son after the father's death. We think that the debt here is not of such a contractual nature as to impose legal liability on the respondent after he ceased to be a citizen of California and became domiciled in Texas.

This cause of action in so far as it concerns the accruals after respondent's removal to Texas cannot be said to have arisen while respondent was under the legislative jurisdiction of California. Restatement Conflict of Laws, Sec. 457, puts it this way:

"A state has legislative jurisdiction to impose upon one person a duty to support another person if

(a) the person to be supported is domiciled within the state and the person to support is subject to the jurisdiction of the state, or

(b) the person to support is domiciled within the state although the person to be supported is not subject to the jurisdiction of the state, or

(c) both parties are subject to the jurisdiction of the state, though neither is domiciled there."

In Berkley v. Berkley, Mo., 246 S.W. 2d 804, 34 A.L.R. 2d 1456, the wife domiciled in California sued her husband, domiciled in Missouri, to recover a sum expended for the support of their minor child who was in the care and custody of the mother. The parties, prior to their separation, had resided in and were citizens of California. The defendant sought to have the California law applied that would relieve him of this obligation. The court to the contrary, held that the law of Missouri would control in this action.

Yarborough v. Yarborough, 290 U.S. 202, 54 Sup. Ct. 181, 78 L. Ed. 269, cited and relied upon in Berkley v. Berkley, supra, in passing upon a somewhat similar conflict decided:

"That the character and extent of the father's obligation, and the status of the minor, are determined ordinarily, not by the place of the minor's residence, but by the law of the father's domicile."

The law thus announced would control in the situation we have here. The State of Texas does not expressly and unqualifiedly impose upon a son a duty to reimburse the State for moneys expended and charged by the State for the support of an indigent parent in state hospitals. Vernon's Civil Statutes, Art. 3196a, Section 2. We hold there can be no recovery by the State of California against respondent for support rendered to his parent after respondent removed from the State of California and became domiciled in this State.

Petitioner relies partly upon our uniform Reciprocal Enforcement Act, Article 2328b, and particularly upon Section 7 thereof reading:

"Duties of support enforceable under this law are those imposed or imposable under the laws of any state where the alleged obligor was present during the period for which support is sought or where the obligee was present when the failure to support commenced, at the election of the obligee, * * *."

But whether entitled to or not, the petitioner did not bring its suit under the provisions of this act nor comply therewith. We hold, therefore, that respondent is not liable for any sums accrued after his removal to this state.

■ As to the second question, namely, the applicability vel non of the Texas two-year statute of limitation, the general rule is that questions of substantive law are controlled by the laws of the state where the cause of action arose, but that matters of remedy and of procedure are governed by the laws of the state where the action is sought to be maintained. Home Ins. Co. v. Dick et al., Texas Com. App., 15 S.W. 2d 1028 reversed on other grounds 281 S.W. 397, 74 L. Ed. 926. To this rule there are exceptions.

■ The weight of authority favors the rule or exception to the foregoing general rule that where the statute creates a right and also incorporates a limitation upon the time within which the suit is to be brought, the limitation qualifies the right so that it becomes a part of the substantive law rather than procedural, and that unless suit is brought within the time allowed by statute no right of action can be maintained even though the law of the forum provides for a longer period of limitation. Stumberg Conflict of Laws, 2d. Ed. p. 150.

Some courts have gone further in holding that in such a situation the lex loci would prevail even though the time had elapsed under the limitation staute of the forum. This exception, as stated in 53 C.J.S., Limitation of Actions, Sec. 30, is as follows:

"Where by statute a right of action is given which did not exist by the common law, and the statute giving the right fixes the time within which the right may be enforced, the time so fixed becomes a limitation or condition on such right, and will control, no matter in what forum the action is brought, and such rule does not make the general provisions of the statute of limitations existing in the jurisdiction where the liability was created operate extraterritorially. * * *."

See also 15 C.J.S., Conflict of Laws, Sec. 22e.

Although there exists quite a cleavage among the authorities as to the validity of this exception,[1] we prefer to follow those decisions that would treat the limitation in the California statute as substantive and not procedural. In Theroux v. Northern P. R. Co., 27 U.S. App. 508, 64 Fed. 84, the Court reasons as follows:

"Where a statute confers a new right, which by the terms of the act is enforceable by suit only within a given period, the period allowed for its enforcement is a constituent part of the liability intended to be created, and of the right intended to be conferred. The period prescribed for bringing suit in such cases is not like an ordinary statute of limitations, which merely affects the remedy. It follows, of course, that if the courts of another state refuse to permit the cause of action to be sued upon during a part of the period limited by the foreign law, to that extent they refuse to give effect to the foreign law, and by so doing impair the right intended to be created."

Other cases supporting this theory are: Norman v. Baldwin, 152 Va. 800, 148 S.E. 831; Brunswick Terminal Co. v. National Bank, 99 Fed. 635, 48 L.R.A. 625; Negaubauer v. Great Northern Ry. Co., 92 Minn. 184, 99 N.W. 620; Nick Maki v. George R. Cooke Co., 124 Fed. 2d 663, 146 A.L.R. 1352 and Wilson v. Massengill, 124 Fed. 2d 666. The latter two cases expressly approve the doctrine advanced in Theroux v. Northern P. R. Co., supra. Strictly speaking, we think these two so-called exceptions to the general rule, that the law of the forum controls as to procedural matters, are not exceptions at all because the limitation on the statutory right is regarded as substantive and not one of remedy.

The contrary view, namely, that the limitation statute of the forum will control is expressed in Tieffenbrun v. Flannery, 198 N.C. 397, 151 S.E. 857, 68 A.L.R. 210, and Rosenzweig v. Heller, 302 Pa. 279, 153 A. 346, and others.

■ Again the United States Supreme Court in Engel v. Davenport, 271 U.S. 33, 70 L. Ed. 813, 46 Sup. Ct. 410, 413, in reversing the California decision, 194 Cal. 344, 228 Pac. 710, held the limitation provision in the Federal statute to be controlling

---

1.—68 A.L.R. pp. 217-222, 146 A.L.R., pp. 1356-1360. 35 Texas Law Review 95.

since the right to maintain the suit at any time within two years was a substantive right, an essential part of the cause of action so created, and not merely remedial, the Supreme Court saying that: "As a provision affecting the substantive right created by Congress in the exercise of its paramount authority in reference to the maritime law, it must control in an action brought in a state court under the Merchant Marine Act, regardless of any statute of limitation of the state." It may be argued that the Federal statute enacted by the Congress in a field over which it has paramount authority might rest on a different basis from that of state legislative action. On the other hand it is difficult to see how there is a difference in principle because the State Legislature is equally paramount within its own jurisdiction.

For yet another reason, it would seem proper here to apply the California statute with respect to the time limitation. Although we have a general statute of limitations of two years, Art. 5526, Vernon's Ann. Civ. Stat., applicable to "actions for debt where the indebtedness is not evidenced by a contract in writing," it would not apply to a demand of this nature brought by the State of Texas. It would seem proper, therefore, under the circumstances, to extend comity to the State of California and uphold the right of that state to commence this action within the four-year period as provided in the California statute.

■ It cannot be said that the maintenance of this suit in Texas and the rendition of a judgment in California's favor for the amount accruing before the respondent became a citizen of Texas is against the public policy of this state.[2] It is true that our Legislature has not seen fit to enact a statute to impose legal liability upon a son for the maintenance of a parent inmate in a state institution, although it does by statute obligate the husband or wife and the father or mother, if financially able, to bear the expense of maintaining a patient in a state hospital where the patient has not sufficient estate of his own. Art. 3196a, Sec. 2, Vernon's Ann. Civ. Stat. Sec. 5 of that article permits the state to proceed to collect the amount from those so obligated in a civil action. And not only that, but our Probate Code, Sec. 423, requires that an incompetent person, having no estate of his own, shall be maintained by the husband or wife and by the father or mother and even by the children and grandchildren, if able to do so.

---

2.—35 Texas Law Review 759.

Although our Legislature has not adopted the policy of requiring an adult son to support a parent or to reimburse the state, under the circumstances involved here, it is quite another thing to say that it is against the public policy of this state to enforce the California obligation, and particularly so when our state has statutes of similar import and character. Strawn Mercantile Co. v. First National Bank of Strawn, (Texas Civ. App.), 279 S.W. 473; Texas & N. O. Ry. Co. v. Miller, 60 Texas Civ. App. 627, 128 S.W. 1165.

■ In this respect we think the rule is correctly announced in Herrick v. Minneapolis & St. L. Ry. Co., 31 Minn. 11, 16 N.W. 413: "To justify a court in refusing to enforce a right of action which accrued under the law of another state, because against the policy of our laws, it must appear that it is against good morals or natural justice, or that for some other such reason the enforcement of it would be prejudicial to the general interests of our own citizens." This rule has been approved by the United States Court of Appeals for the Fifth Circuit. Evey v. Mexican Central Railway Co., 81 Fed. 304, 38 L.R.A. 387; Burt v. Isthmus Development Co., 218 Fed. 2d 353.

This California statutory requirement of support does not run counter to good morals or natural justice or appear prejudicial in any way to the general interest of the citizens of Texas.

We, therefore, hold that the petitioner is entitled to judgment for the sum of money charged by the State of California for the support of his mother while the respondent was a citizen of that state that accrued within four years of the commencement of this suit and will be denied recovery for any sums that accrued after respondent's removal to this state.

The judgments of both the trial court and the Court of Civil Appeals are reversed and the cause remanded to the trial court for the entry of a decree in accordance with the foregoing views.

Opinion delivered January 15, 1958.

JUSTICE GREENHILL, joined by JUSTICES GRIFFIN and CALVERT, dissenting.

The majority correctly announces that this is a case of first impression in Texas. Under the particular facts of this case, and because of the announced policies of the several states, including Texas, in the recent enactment of Uniform Support Acts

and the Probate Code of Texas, I believe this to be a case of first impression in the United States.

The majority opinion states that its decision is based on decisions which it cites from other jurisdictions. I do not believe that those opinions are controlling. They will be discussed herein.

It seems to me that the better rule is stated in 11 American Jurisprudence 310, Conflict of Laws Section 11:

"The fundamental question determinative of the enforcement of statutory rights arising in another state is whether there is a substantive right originating in one state and a corresponding liability which follows the person against whom it is sought to be enforced into another state. Such a right, arising under a local statute, will be enforced ex comitate in another state *unless there is a good reason for refusing to enforce it.* It will be enforced, not because of the existence of the statute, but because it is a right which the plaintiff has legitimately acquired and which still belongs to him."

The majority opinion relies on what it says is the "universally recognized rule that no statutes of a state *ex proprio vigore* [by their own force and vigor] have extraterritorial effect." The cases generally cited for that proposition are founded on the premise that one nation or state will not enforce a statute of another nation or state which is penal in nature, or which, from a civil standpoint, is contrary to the public policy of the enforcing state or nation. The California statute, as involved here, is not penal, and the majority concedes that the statute is not against our public policy. The *ex proprio vigore* cases, therefore, are not controlling here.

This doctrine under which nations or state will not enforce "foreign" statutes is set out in 11 American Jurisprudence 310:

"There are several situations in which it is well established that the forum will not enforce a foreign statutory right. Thus, a right given by statute will not be enforced by the courts of another jurisdiction if the statute is against the policy of the law of the forum, if the enforcement of the right would work injustice to the citizens of the state where the action is brought, if the right, by the terms of the statute creating it, is to be enforced by prescribed proceedings within the state of its enact-

ment, or if it is of such a kind that, with a due regard for the interests of the parties, a proper remedy can be given only in the jurisdiction where it is created."

The negative of the rule is that we will not enforce the California statute if it is against our public policy, if it would work an injustice, if it is penal in nature, if the right can be enforced only by proceedings of the enacting state, or if the proper remedy can only be given in the enacting state. The positive rule, above set out, is that the right "will be enforced *ex comitate* [out of comity] unless there is a good reason for not enforcing it."

As will be set out hereinafter, there is no evidence in this record that the enforcement of the statute will not work an injustice. The remedy and procedure are available here, and the statute is not against our public policy. In short, I see no good reason for not enforcing California's rights and those of the dependent mother.

The respondent here, Copus, and his mother had been residents of California for many years. While both were there, she became mentally ill. She was placed in a California hospital and is still there. The need for care which began when both were residents of California continues. Under the California law, Copus is required to contribute to his mother's support. His moral duty[1] became, under California law, his legal duty. The legal obligation attached to Copus while he was a California resident. Nothing has happened to relieve him of that obligation except that he crossed state lines and took up residence here.

The majority opinion recognizes Copus' duty and the validity of California's claim and enforces it in Texas with a Texas decree for that period of time when he was in California and until he came to Texas. As I view it, the bare legal point here is: does the fact that Copus moved to Texas, standing alone, relieve him of his legal obligation to contribute thereafter to his mentally-ill mother's support? I think not. Texas should not

---

1.—The Fifth Commandment is "Honor thy father and thy mother . . . ," Exodus 20.12. "Like others in this code of laws, it is directed to the adult citizen who is burdened with the care of an aged parent, and is a warning against the heathen habit of abandoning the aged when they can no longer support themselves." "This commandment most especially refers to the treatment of helpless aged dependents." Medical science has progressed so efficiently that modrn nations are comprised more and more of old people. 1 Interpreter's Bible 985, Abingdon-Cokesbury Press, 1952.

become a haven for deserting providers who would ignore or repudiate their duty to support.

Viewed the other way, if Copus and his mother had been Texas citizens and he were obligated in Texas to contribute to her support, should he be able to shirk that responsibility by just moving out of the State?

There is no evidence before us that Copus is unable to support his mother, that other relatives should bear or share in the burden, or that she has forfeited any right to support from her son. There is no evidence that the original $40 per month or the subsequent $90 per month of support is excessive, discriminatory, or inequitable. We do not have before us a situation in which liability to support arises after the obligor has left the state or a situation in which the obligor has never been in the state in which the person to be supported resides. The only defense offered is that Copus left California and came to Texas.

The majority opinion correctly states that it is not against the public policy of Texas to enforce such an obligation. Our policy in that regard has been fixed in comparatively recent times by the enactment of our Uniform Support Act[2] and the Texas Probate Code.[3]

Section 423 of the Probate Code provides:

"Where an incompetent has no estate of his own, he shall be maintained (a) by the husband or wife . . . if able to do so; or if not ((b) by the father or mother . . . if able; or if not, (c) *by the children and grand children of such person* respectively if able to do so; or if not (d) by the county . . . ."

The Legislature has thus determined that it is the policy of Texas that under the circumstances above set out, an incompetent person (such as the mother here) shall be supported by her children, if able. The mother here was incompetent.

Section 8 of our Uniform Support Act provides that a *State* [California] shall have the same right to enforce support as the person to be supported [the mother] has; under Section 7,

---

2.—Acts 1951, 52nd Leg., ch. 377, p. 643, as amended by Acts 1953, 53rd Leg., ch. 374, p. 907, being Article 2328b, Vernon's Texas Civ. Stat.

3.—Acts 1955, 54th Leg., p. 88, ch. 55.

"the duties of support enforceable under this law are those imposed under the laws of any state [California] * * * *where the obligee* [the mother] *was present when the failure to support commenced* * * * * " The mother was certainly present in California when this obligation arose.

Section 9 says that, "All duties of support are enforceable * * * irrespective of relationship between the obligor [Copus] and the obligee [his mother]. An exception not applicable here is made in Section 7 regarding alimony to a former wife.

It is true that California did not attempt to comply with the Uniform Support Act. This case would have been much easier if it had. Under that Act, a California Court would have certified to a Texas Court the identity of the parties, the duty to support, and law requiring the support requested. However, all that is required to have been done or which could have been done by the certifying court in California under the Support Act has been directly accomplished and proved in the Texas district court. The facts and the California law are stipulated. So here, in my opinion, we have the substance of the Uniform Support Act but not the form.

Section 3 of the Act states that "The remedies herein provided are *in addition* to and not in substitution for any other remedies." It is not intended to be the exclusive remedy. *Ex Parte Helms*, 152 Texas 480, 259 S.W. 2d 184 (1953). To say the least, it does not evidence an intention that the policy of the State of Texas is to deny enforcement of a duty fixed on Copus when he left California and came to Texas and which, but for his removal to Texas, still exists.

The majority opinion holds that to require Copus to contribute to the support of his mother would be to deny him the equal protection of the laws. I disagree. Both Texas and California have statutes authorizing the Court to require support of parents. Moreover, if the Uniform Support Act had been invoked and followed here, and a recovery allowed under it, that Constitutional point would be the same.

I do not believe that the equal protection clause was intended to relieve a person of his duties by crossing state lines. The reasonableness of the classification under California law did not become unreasonable or unconstitutional because Copus moved to Texas. The requirements of the equal protection clause are met if the laws of each state apply with equal force to persons

similarly situated. A classification is repugnant to this provision when it is unreasonable, arbitrary, or capricious. Such classifications are not unreasonable when based upon sound considerations of public policy. Carried to its logical extreme, the holding would render all reciprocal laws unconstitutional until they are enacted by all states.

There is one Ohio case, not cited in the majority opinion, which reaches the same result as the majority opinion here on the equal protection clause, but is distinguishable. In *Pennsylvania v. Mong*, 117 N.E. 2d 32 (1954), the defendant's indigent father lived in Pennsylvania. Pennsylvania brought suit in Ohio, under the Uniform Support Act, against an Ohio son. Ohio, however, had a statute which denied support from a child to a parent who had abandoned such child before the child became 16 years of age. The Ohio law in this regard was substantially different from the Pennsylvania law. The parent there had so abandoned the child. Recovery was denied in Ohio by a divided court on the ground of equal protection; i.e., that Ohio children who had been abandoned may not be required to contribute to the support of the parent in Ohio. So it would be discriminatory to make an Ohio son support his parent (who had abandoned him) in another state. The Ohio statutory exception is not unreasonable, and it fixed the policy of Ohio as being affirmatively opposed to the support of the parent under the circumstances. The case, therefore, to me, reaches the correct result on the wrong ground.[4]

*De Brimont v. Penniman*, 7 Fed. Cases 309 (No. 3715), although not cited by the majority opinion, might also support the majority view; but it also is distinguishable. There an American girl in France married a Frenchman. Her parents went to France after the marriage. When they returned to New York, the French son-in-law sued the American parents on a French judgment for support under a French statute which authorized son-in-law and father-in-law support. The Federal Court correctly denied liability. The Court found that the French statute was "hostile to the policy of this country." The Court recognized, however, that in many of our states, "The duty of parents and grandparents, and reciprocally, of children and grandchildren when of sufficient ability, to provide for the necessary support * * * is declared and enforced."

---

4.—The case is noted and criticized in 67 *Harvard Law Review* 1435; 102 *University of Pennsylvania Law Review* 938; and 40 *Virginia Law Review* 489.

The majority opinion cites and relies on Section 457 of the Restatement of Conflict of Laws. The Restatement was prepared in 1934 before the preparation and adoption of the Uniform Support Act. That Act was designed in part to combat an alleged "indifference of many states which would refuse or neglect to enforce support in favor of out-of-state dependents on the theory, often tacitly admitted, that one state has no interest in helping another state rid itself of the burdens of supporting destitute families."[5]

Thus if this section of the Restatement ever expressed the policy of the State of Texas, it was superseded by our adoption of the Uniform Support Act in 1951.

The majority opinion cites *Berkley v. Berkley*, 246 S.W. 2d 804 (Mo. Sup. 1952). There a California wife brought suit in Missouri against her husband, a resident of Missouri, for reimbursement for funds expended by her for the support of their minor child who lived with the mother in California. She had worked to support the child, but the father refused to contribute to the child's support. The father attempted to set up in Missouri a technhical defense, that, under California law, a father is not liable for reimbursement to the mother for the support of a minor child unless he expressly agrees to do so. The Missouri Court held that the father was a citizen of Missouri, and the law [public policy] of Misosuri required him to support his minor children whether they were in Missouri or not.

To the *Berkley* case could be added *Commonwealth v. Acker*, 197 Mass. 91, 83 N.E. 312 1908, (noted in "Simplifying the Conflict of Laws," by Dean E. S. Stinson, 36 *Am. Bar Assn. Journal* 1003). There Acker, his wife and child lived in Nova Scotia. He abandoned them and got a job in Massachusetts. His wife went also to Massachusetts, although separated from her husband. The child was left in Nova Scotia. Acker was prosecuted in Massachusetts for failure to support the child in Nova Scotia. (No evidence was introduced as to the law of Nova Scotia.) In sustaining Acker's conviction the Court held:

"The offender is here within our jurisdiction. While residing here, he ought to make provision for the support of his wife and

---

5.—Commissioners' Prefactory Note in *Handbook, National Conference of Commissioners on Uniform State Laws*, 291, 292 (1952), cited in "Interstate Recognition of Support Duties" by Albert A. Ehrenzweig, 42 *California Law Review* 382, at 383 (1954).

minor child, whether they are here or elsewhere. If he fails to do so, his neglect of duty occurs here without reference to the place where proper performance of his duty will confer benefits."

Both cases are properly decided. Where the policy of the forum is to require support, or where its policy is at least not to the contrary and the duty arises out of a valid statute of a sister state, the duty to support should be at least recognized. Here, without regard to equitable considerations, we simply refuse to recognize the mother's and California's rights and Copus's duties under the California statute after he moved to Texas.

The *Berkley* case is annotated in 34 A.L.R. 2d 1460 (1954). The annotator states the rule to be:

"A state may be limited in the conflict of laws rules by provisions of the Federal Constitution, and in particular by the full faith and credit clause, the equal privileges and immunities clause, and the due process clause * * * *

*"None of these clauses prevents a state from choosing the law of the father's or the child's domicile as governing the existence and extent of the father's duty to support the child."*

The remaining case cited by the majority is the *Yarbrough* case, 1933, 290 U.S. 202, 54 Sup. Ct. 181, 78 L. Ed. 269. There a husband and wife were divorced in Georgia. By agreement between the spouses, a lump sum was awarded and paid by the husband for the support of their minor child. When money had been exhausted, and the child was living in South Carolina with her grandfather, a suit was brought in South Carolina to require the father, a resident of Georgia, to make further provision for the child's support. An award for the child's support, based upon her need, was affirmed by the Supreme Court of South Carolina. The Supreme Court of the United States reversed the South Carolina judgment and held that the Georgia judgment precluded any further claim for support of the child.

Justices Stone and Cardozo, with whom I agree, dissented upon the ground that Georgia had full authority to adjudge the rights of the parties as of the time of the adjudication, but that South Carolina had jurisdiction to require further support on changed conditions. "The measure of the duty is the need of the child and the ability of the parent to meet those needs at

the very time when the performance of the duty is envoked. Hence, it is no answer * * * that at some earlier time provision was made for the child, which is no longer available * * * *."

The majority opinion in the *Yarborough* case is criticized by an eminent authority on Conflicts:

"The decision seems unsound, in that the Georgia judgment was based upon conditions at the time of the original decree. Need of additional support in South Carolina upon change of domicile to that state was not before the Georgia court and for that reason was not adjudicated in the proceedings in the latter state. Actually, the [Yarborough] case only decides, however, that a judgment for a lump sum relieving a father from any further duty precludes a further claim." Strumberg, *Conflicts of Laws* (2nd Ed. 1951), p. 345.

The *Yarborough* case is also discussed in "Interstate Recognition of Support Duties" by Albert A. Ehrenzweig of the California Law faculty, 42 *Calif. L. Rev.* at 385 (1954). It is there said that the statement in the *Yarborough* case that "the character and extent of the father's obligation, and the status of the minor, are determined ordinarily not by the place of the minor's residence but by the law of the father's domicile," is "mere dictum, lacks support in precedent, and is open to serious objections on ground of policy." In the words of Justice Stone, such a rule would enable a deserting provider "by the expedient of choosing a domicile other than the state where [his dependent] is rightfully domiciled, to avoid the duty which that state may impose * * * *." 290 U.S. at 225, 54 Sup. Ct. at page 190.

It should, of course, be the policy of the State to protect its citizens and its state's rights. But states' rights carry states' responsibilities. This being a case of first impression, it would be better to set a precedent of co-operation and enforcement of the duty which is not contrary to our own public policy. The better policy would be to minimize the loopholes which allow evasion of support responsibilities and duties. Such a policy is preferable to one which allows a person under a duty to support in his own state to cross a state line and figuratively thumb his nose at his home state and those to whom he owes the duty to support.

This Copus case was the subject of a leading article on "Policy Problems in Conflicts Cases" by Professor Joseph Dainow in 35 *Texas Law Review* 759 (June 1957). Concerning the problem the author says:

"Of course, it is a matter of permanent policy for a state to protect its own people, and if this policy were carried to its logical ultimate, it would greatly simplify the complications and confusion in conflicts cases. In fact, it could almost eliminate the whole subject of conflict of laws by favoring the local boy in all contests with a foreigner * * * *

"By its nature, a rule of conflict of laws generally contemplates the possibility of the decision being made in accordance with a foreign law. In a sense, this may be viewed as the relinquishment of a measure of sovereignty; more properly, it is the exercise of an attribute of sovereignty. In the process, it is possible that the application of a foreign law in accordance with the local conflicts rule would produce a result that is too undesirable to be permitted. To prevent something so utterly repugnant—a result that would run too much against the grain of a local society and its mores—there has been reserved an exceptional corrective under the name of 'public policy.' When no other regular legal technique will do the job, public policy is called upon to prevent the violation of 'some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of common weal.' "

As conceded by the majority here, and as set forth in our Probate Code and our Uniform Support Law, the enforcement of the California statute is not contrary to our public policy. So far as I can ascertain, no provision of the constitution or laws of this State or the United States would prevent our honoring and enforcing the California statute. The authority first cited herein correctly states that such will be enforced unless there is good reason for refusing to enforce it. There being no good reason shown in this record, it should be enforced.

The Texas trial court found that "the liability of * * * Copus is a continuing one; and that the removal of the defendant [Copus] to Texas * * * does not discharge him from such continuing liability."

I would affirm the judgment of the trial court.

Opinion delivered January 15, 1958.

Rehearing overruled February 19, 1958.